

FILED

JUN 21 2016

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

***POSTED ON WEBSITE***
***NOT FOR PUBLICATION***

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 15-26465-D-7 |
| Scott Charles Pomeroy, | Docket Control No. GHJ-1 |
| Debtor. | Date: June 15, 2016 |
| | Time: 10:00 a.m. |
| | Dept: D |

<u>**MEMORANDUM DECISION**</u>

This is the trustee's amended objection to the debtor's claim of exemption of an asset described by the debtor as an "ERISA Qualified Retirement Account" named the "Pomeroy Retirement Trust" (the "Plan"). The debtor filed opposition and the trustee filed a reply. Having heard oral argument at the initial hearing, the court gave the debtor time to supplement the record and the trustee time to respond, which they have done. For the following reasons, the objection will be overruled.

There are three assets alleged by the debtor to be in the Plan: (1) a vacant lot in Truckee, California; (2) an account at Wells Fargo Bank; and (3) an account at Scottrade. The debtor claims the Plan as exempt under (1) Cal. Code Civ. Proc. § 703.140(b)(10)(E); and (2) § 522(b)(3)(C) and (4) of the Bankruptcy Code.[1] The court concludes the exemption is properly

---

1. The debtor also claimed the Plan as exempt under § 522(p) of the Bankruptcy Code, but has since conceded that was a mistake. That claim of exemption will be considered to have been
(continued...)

claimed under both sections.  The court will begin with the former.

Code of Civil Procedure § 703.140(b)(10)(E)

Under this subsection, a debtor may exempt a payment under a stock bonus, pension, profit-sharing, annuity, or similar plan, (1) to the extent reasonably necessary for the support of the debtor and his or her dependents, (2) unless (a) the plan was established by an insider that employed the debtor at the time the debtor's rights under the plan arose; (b) the payment is on account of age or length of service; and (c) the plan does not qualify as tax-exempt under any of a group of sections of the Internal Revenue Code.  The latter three factors are in the conjunctive; that is, if all three are present, the plan is not exempt.  If any of the three statements is not true, the plan is exempt (to the extent it meets the reasonably necessary test).  The trustee raises arguments on all of these issues.  The burden of proof on all these issues is on the debtor.  Cal. Code Civ. Proc. § 703.580(b); Diaz v. Kosmala (In re Diaz), 547 B.R. 329, 337 (9th Cir. BAP March 11, 2016).  A brief discussion of the debtor's standard of proof appears at the end of this ruling.

The trustee contends all three of the "unless" factors are present in this case; that is, he contends the Plan was established by an insider – the debtor himself, that the Plan is on account of age, and that the Plan does not qualify as tax-exempt.  The debtor concedes the point as to the second factor:  the Plan is on account of age.  However, at least one of

1.(...continued)
withdrawn.

- 2 -

the other factors is not present here:  in its discussion of

Bankruptcy Code § 522(b)(3)(C), below, the court concludes the

Plan is tax-exempt.  As the factors are in the conjunctive, and

as at least one is not present in this case, the court need not

determine whether the first factor is present – whether the Plan

was established by an "insider that employed the debtor."

The trustee takes the position that "necessary for the

debtor's support" means necessary for his support now (or more

precisely, as of the petition date), not when he retires.  "In

the end, the Debtor's arguments about 'reasonably necessary for

support' boil down to speculation that he will need the

retirement assets at some point in the future.  However, the test

is not whether he will someday need the assets for support; the

test is whether the assets were necessary for his support when he

filed his petition."  Trustee's Initial Reply, DN 50 ("Initial

Reply"), at 8:6-9.  The trustee begins with the well-known

proposition that a debtor's exemption rights are determined as of

the petition date,[2] and from that, proceeds to the unqualified

statement that "[n]othing in <u>Hamo</u> or any of the similar decisions

on the subject has used a debtor's retirement needs as a basis

for holding that a debtor has satisfied the 'reasonably necessary

for support' test."  Initial Reply at 7:13-14.  On the contrary,

both <u>Hamo</u> and case law from courts within the Ninth Circuit

consider whether the debtor will need the retirement assets for

his or her support when he or she retires.  The trustee has cited

---

2. <u>Wolfe v. Jacobson (In re Jacobson)</u>, 676 F.3d 1193, 1199
(9th Cir. 2012) ["bankruptcy exemptions are fixed at the time of
the bankruptcy petition."]; <u>Cisneros v. Kim (in Re Kim)</u>, 257 B.R.
680, 687 (9th Cir. BAP 2000) [same].

no case, and the court has found none, where the court limited its consideration to a debtor's need for his retirement assets at present in a situation where the debtor is not yet retired, and from a policy standpoint, it would make no sense whatsoever to do so.

The Hamo decision the trustee refers to is Hamo v. Wilson (In re Hamo), 233 B.R. 718 (6th Cir. BAP 1999).  In that case, the Sixth Circuit Bankruptcy Appellate Panel listed what it called the factors the courts uniformly consider in making the reasonably necessary determination; the list includes "[t]he debtor's present and anticipated living expenses" and his "present and anticipated income from all sources."  233 B.R. at 723 (emphasis added).  The panel found not clearly erroneous the bankruptcy court's finding that a portion of the debtor's IRA was "reasonably necessary to sustain his basic needs in the future." Id. at 724 (emphasis added).  As to the remaining portion of the IRA, the panel considered that "no evidence was presented to indicate that the Debtor's future living expenses would substantially increase or that his wife would become unable to continue to pay his expenses." Id.  All of these are forward-looking considerations that would not have been relevant under the trustee's theory in the present case.

The Bankruptcy Appellate Panel in this circuit enunciated a similar list of factors in In re Moffat, 119 B.R. 201 (9th Cir. BAP 1990):  they are "the debtor's present and anticipated living expenses and income; the age and health of the debtor and his or her dependents; the debtor's ability to work and earn a living; the debtor's training, job skills and education; the debtor's

- 4 -

other assets and their liquidity; the debtor's ability to save
for retirement; and any special needs of the debtor and his or
her dependents."   119 B.R. at 206 (emphasis added).   If the
trustee is correct that the only issue is whether a retirement
plan is "necessary for support" at present, it is difficult to
see how the debtor's anticipated living expenses and income, his
or her age and health, and his or her ability to save for
retirement should be factors in the analysis at all.

The court in In re Pipkins, 2014 Bankr. LEXIS 2654 (Bankr.
N.D. Cal. 2014), directly addressed the issue the trustee raises.
In that case, the trustee contended, exactly like the trustee
here, that "the court should not consider any such [post-
petition] changed circumstances, as any determination of amounts
reasonably necessary for Debtors' support should be based on
Debtors' financial condition as of the petition date."   2014
Bankr. LEXIS 2654 at *27.[3]   The court rejected the trustee's
position.   "While a 'debtor's exemption rights are determined as
of the petition date' [citing, like the trustee here, In re Kim,
257 B.R. 680 (9th Cir. BAP 2000)], a determination of the extent
to which assets are necessary for the support of debtors and
their dependents is necessarily a forward-looking one under
California law."   Pipkins, 2014 Bankr. LEXIS 2654 at *27.
/ / /

3.    In the words of the trustee in the present case:   "To
the extent that the Debtor wants to present evidence of changed
circumstances since he filed his Chapter 7 petition, the Court
should reject the attempt.   Under Ninth Circuit BAP authority,
exemptions are determined as of the petition date.   Cisneros v.
Kim (In re Kim), 257 B.R. 680, 687 (BAP 9th Cir. 2000)."   Memo.
at 10:20-21.

- 5 -

Referring to the <u>Moffat</u> factors, the court stated,

> If a court should consider 'anticipated living expenses and income' to determine the extent to which an asset is necessary for the debtor's reasonable support, the court is not limited to considering a debtor's financial condition as of the petition date. Otherwise, a debtor who has no occupation or income as of the petition date but has the ability to work and earn a living soon thereafter could exempt all of the asset as reasonably necessary for his or her support. There would be no need for a court to consider that debtor's ability to work, training, job skills or education, and -- most importantly -- "anticipated" expenses and income.

<u>Id.</u> at 27-28.  The opposite is also true, as in this case.  If a court is limited to considering the debtor's financial condition as of the petition date, when the debtor is presently working and, in the trustee's words, able to "make ends meet," although barely, there would be no need for the court to consider his age, his likely remaining working years, his ability or inability to save for retirement during those years, or the income and expenses he can anticipate in his retirement years, all of which, under the <u>Moffat</u> decision, are appropriate considerations.

Further, the trustee's theory does not make sense from a policy standpoint.  In <u>In re McKown</u>, 203 B.R. 722 (Bankr. E.D. Cal. 1996), another department of this court held that IRAs are sufficiently similar to pension or profit sharing plans to be exempt under § 703.140(b)(10)(E).  203 B.R. at 726.  In doing so, the court reasoned:

> IRAs and stock bonus, pension, profit sharing, and annuity plans share a common denominator.  They are "aimed to enable working taxpayers to accumulate assets during their productive years so that they might draw upon them during retirement."  The limitations placed upon IRAs are geared to insure they are used to provide income "during a taxpayer's advanced years, which is the purpose shared by all retirement plans."

- 6 -

1  *Id.* at 724-25 (citation omitted).  Application of the trustee's

2  theory - looking strictly at the debtor's present needs - would

3  deprive debtors of the assets they have managed to save, although

4  they will need those assets when they retire, simply because they

5  are still able to "make ends meet" with their present employment.

6  In short, it would undermine the purpose of IRAs and pension

7  plans by discouraging people from saving for retirement.

8      Finally, the trustee cites the well-known rule of statutory

9  construction that when one statute uses the same language as

10  another, the courts will infer Congress intended the same meaning

11  in both statutes.  The trustee cites the Civil Procedure Code

12  sections governing the exemption of alimony (§

13  703.140(b)(10)(D)), payments on a wrongful death award or under a

14  life insurance policy, and payments on account of lost future

15  earnings (§ 703.140(b)(11)(B), (C), and (E)), all of which permit

16  an exemption to the extent the payments are reasonably necessary

17  for the support of the debtor and his dependents.  In the

18  trustee's view, "[s]ince none of the[se] other statutes rely on a

19  debtor's retirement needs, it would be inappropriate to do so

20  here, notwithstanding that the issue is arising in connection

21  with a statute that involves retirement accounts."  Initial Reply

22  at 7:28-8:2.

23      The trustee's analysis, ignoring as it does the nature of

24  the asset exempted by the particular statute, does not hold

25  water.  As another department of this court observed:

26          Section 703.140(b)(10)(E) . . . permits the exemption
            of a "right to receive" payments from a plan.  The
27          statute does not specify a "present," "immediate,"
            "existing," or "vested" right to receive payments.  It
28          specifies only a "right to receive" a payment on

account of age.  This looks forward into the future of
the debtor.  The right to receive payments from the IRA
may be a present one or one which arises in the future.

In re McKown, 203 B.R. at 725.  In this case, the debtor's right
to receive payments under the Plan without penalty, will, absent
a hardship, arise at retirement age.  Although the statute
contains the same "reasonably necessary" language as those
exempting alimony, payments in compensation of lost earnings, and
so on, the statutes must be considered in light of the purpose of
the statute and the nature of the asset being exempted – here,
the right to receive retirement income.  In this light, there is
no logical reason to consider the reasonably necessary test only
from the standpoint of the debtor's present financial
circumstances and not those that will pertain at the time his
"right to receive" the payments arises.

     For these reasons, the court rejects the trustee's theory,
and will consider whether the Plan is reasonably necessary for
the debtor's support based on what his income and expenses are
likely to be in retirement and based on what changes are likely
to take place between now and then.

     At the commencement of this case, the assets in the Plan
totaled $409,383 in value.  The debtor is 56 years old.  The
court takes judicial notice that the average life expectancy of a
56-year old man in the United States as of May 1, 2016 is 27
years.  Calculators: Life Expectancy. ssa.gov. Social Security
Administration. Web 12 May 2016.  Assuming the debtor works nine
more years, his average life expectancy at retirement would be 18
years.  Thus, assuming the debtor does not need to take hardship
distributions from the Plan in the next nine years (and the

- 8 -

evidence suggests he may need to), the court will need to consider whether $409,383 in assets is reasonably necessary for 18 years of retirement.

According to his schedules and statement of affairs, signed under oath, the debtor is employed as a chip runner and dealer at a casino, making $2,130 per month gross, $1,564 net.  His roommate, who is his girlfriend, contributes $1,800 to the household, for total household income of $3,364.  The debtor's girlfriend is 50 years old.  They pay $1,525 per month in rent; their other living expenses total $1,790 per month, bringing their total living expenses to $3,315 and their monthly net income to $49, barely a break-even figure.  The debtor's Schedule J indicates he also contributes $400 per month to college expenses for his daughter; however, that expense brings the household's monthly net income to <$351>.  The trustee does not challenge any of the debtor's living expenses as unreasonable, and the court finds them reasonable, even modest.[4]

---

4.  The trustee cites the debtor's testimony at the § 341 meeting concerning a $2,000 per quarter payment he receives on a loan made by the Plan to a third party.  Under a qualified domestic relations order ("QDRO"), one-half of this payment goes to the debtor's former spouse.  Thus, the debtor receives $1,000 per quarter, or $333 per month, which would offset the <$351> shortfall on Schedule J.  (Essentially, this payment covers the debtor's contribution to his daughter's college expenses.)

The trustee notes that this income does not appear on the debtor's Schedule I and the note does not appear in the list of the Plan's assets on Schedule B.  However, pursuant to Law v. Siegel, 134 S. Ct. 1188, 1195 (2014), the court will not consider those facts.  For purposes of the present issue – whether the Plan is reasonably necessary for the debtor's support – the amount of the income, $333 per month, is not sufficient to tip the scale.  According to a spreadsheet submitted as an exhibit by the debtor, the principal balance of the note is $25,692, of

(continued...)

- 9 -

The debtor's statement of affairs lists his 2015 year-to-date income (that is, through August 14, 2015) as $16,121, his 2014 income as $10,919, and his 2013 income as $44,858 plus $10,050 in unemployment. He also listed as income a $3,704 tax refund received in 2014 and $12,600 in roommate contributions in 2015. The debtor supplemented his income in 2014 by selling a 2012 Kia Sportage, a 2008 Harley Davidson motorcycle, and a 2010 Harley Davidson motorcycle to his girlfriend for a total of $36,000. The debtor is a real estate broker; he operated a real estate coaching business in Verdi, Nevada, between March of 2005 and December of 2011. According to his statement of affairs, the debtor has lived in five different places in the last ten years, including six months in an RV when he moved to Rocklin from Nevada. The RV has since been repossessed.

The debtor owns no real property (except through the Plan, which owns the vacant lot). His personal property assets as of the petition date – other than the Plan – totaled $32,289 in value, including a 2008 Toyota with 83,000 miles, which he valued at $18,188 as of the petition date. With the exception of the Toyota, which is his only vehicle, he has no assets he could sell to generate any significant amount.

The debtor testifies his girlfriend lost her job in February and is now contributing to the household income from unemployment. He states they have had "rough patches" and have no plans to marry. As regards the trustee's claim that the

---

4. (...continued)
which one-half belongs to the debtor's ex-spouse under the QDRO. The debtor's one-half interest is not sufficient to alter the court's conclusion as to the reasonably necessary test.

debtor "has the skill/training to be a successful real estate broker" (Memo. at 10-13-14), the debtor testifies he worked in a Truckee resort area for 18 years, specializing in new construction and representing home builders, not buyers and sellers.  He goes on:

> When the real estate market changed, all the builders left the area because the values dropped so dramatically and [it] no longer made economic sense to build[] [in] that area.  As most if not all my trade was local network based and these builders of new homes did not relocate to the same area, I was bereft of all my networking in a very narrow field of Real Estate. In other words, my real estate market left me.  After trying Real Estate Coaching and Management, I did try to start up my Real Estate business in Roseville, however it is very expensive to start a new Real Estate business in a new area and my efforts failed.  Out of desperation and with no one to take me in on their brokerage without a book of business and recent sales, I had to get a job that would pay me immediate income.

Debtor's Decl., DN 47 ("Decl."), at 4:21-5:9.

The court finds the debtor's testimony credible and the trustee offers none to the contrary.  He merely believes, based on the fact that the debtor was able to build up $409,383 in assets in the Plan over his career, "he should be able to make a very good living in real estate."  Memo. at 10:15-16.  On the contrary, a total of $409,383 in retirement assets is not overly large for virtually an entire career.  And the debtor's income in and since 2013 does not support the trustee's conclusion.  In the circumstances described by the debtor, and given his age and unsuccessful attempt to make a new start in real estate, the debtor has demonstrated, and the court finds, it is unlikely the debtor will again be, in the trustee's words, "a successful real estate broker," regardless of his skills and training.

/ / /

1    Finally, the debtor states, "I have calculated that I would
2  receive $2200 per month maximum from Social Security and I have
3  no other pensions or retirements other than the Pomeroy
4  Retirement Trust Plan.  The Real Estate market will never again
5  be what it was in my lifetime and I will have no foreseeable way
6  to add to my retirement funds.  I have no other assets of
7  significance and my job is an 'at will' employment."  Decl. at
8  5:12-16.

9    The court agrees:  it is unlikely the debtor will be able to
10  contribute any amount to retirement savings before he retires;
11  thus, if his exemption of the Plan were disallowed, he would have
12  virtually no income he could depend on in retirement except
13  social security.  Although the debtor presently receives
14  contributions from his girlfriend, she is under no legal
15  obligation to continue making them.  For purposes of this
16  analysis, the court declines to assume she or anyone else will be
17  willing and able to contribute to the debtor's household income
18  once he retires.

19    The trustee has not challenged the debtor's estimate of
20  $2,200 per month from social security, and the court will accept
21  that figure as the amount the debtor is likely to have in income
22  when he retires, absent the Plan.  That modest amount would
23  clearly be insufficient to pay his reasonable living expenses,
24  which at present, total $3,315 (not including his contributions
25  to his daughter's college expenses).  The court finds that to be
26  a reasonable figure for a single individual and does not believe
27  a significantly lower total could be achieved if the debtor's
28  girlfriend did not live with him.  Using these figures, the

debtor's income would be short by $1,115 per month of meeting his current expenses.  The debtor's health-related expenses will likely increase as he ages, which would only increase the shortfall.  The court is not willing to speculate that the debtor's girlfriend, who has no legal obligation to do so, will continue to contribute $1,800 per month to his household income. Without that contribution, the debtor would need to deplete the Plan assets significantly even before he retires.  The court will not speculate that what remains when he retires will be sufficient to fund his retirement.

Given the debtor's age and likely inability to save anything further for retirement, he would reasonably be expected to invest the Plan assets in conservative investments not likely to generate significant income.  Nor, given recent economic history, would the value of the Plan reasonably be expected to grow significantly over the next 10 years.  In short, given the debtor's age, his likely life expectancy, his meager income at this time and likely for the rest of his working life, the relatively modest amount he may expect from social security in retirement, the very basic level of his living expenses, and the fact that he has little, if any, assurance of being able to meet those expenses while he is still working, let alone after retirement, the court readily concludes the Plan is reasonably necessary for the debtor's support, and the Plan is therefore exempt under § 703.140(b)(10)(E).

/ / /

/ / /

/ / /

1   Bankruptcy Code § 522(b)(3)(C) and (4)

2      The Vacant Lot

3      Subdivisions 522(b)(3)(C) and (4) were added to the

4 Bankruptcy Code effective in 2005 to "supplement[] the exemptions

5 an opt-out state debtor may take." Mullen v. Hamlin (In re

6 Hamlin), 465 B.R. 863, 870 (9th Cir. BAP 2012). They permit a

7 debtor to exempt "retirement funds to the extent that those funds

8 are in a fund or account that is exempt from taxation" under

9 certain sections of the Internal Revenue Code. The trustee

10 contends the term "retirement funds," as used in the statute,

11 includes only "sums of money" and not real property. He relies

12 exclusively on an incomplete dictionary quotation in Clark v.

13 Rameker, 134 S. Ct. 2242 (2014), and the general rule of

14 statutory construction that Congress says what it means in its

15 statutes and means what it says. The trustee interprets Clark as

16 having "adjudicated the plain meaning of the term 'retirement

17 funds.'" Memo. at 15:18-19. That is not the case. The language

18 the trustee relies on is not even dicta; it is an ellipsis in a

19 dictionary definition as quoted by the Court.

20      The court will begin with what Clark actually adjudicated,

21 as it sheds light on just how misplaced the trustee's reliance on

22 the ellipsis is. The Court held that inherited IRAs are not

23 exempt under § 522(b)(3)(C). Clark,134 S. Ct. at 2244. The

24 Court's analysis was devoted exclusively to the notion that

25 traditional IRAs are accounts that are "set aside for the day

26 when an individual stops working" (id. at 2246), whereas funds in

27 inherited IRAs "are not objectively set aside for the purpose of

28 retirement." Id. at 2247. The Court considered three

distinctions between traditional and inherited IRAs.

> First, the holder of an inherited IRA may never invest additional money in the account. Inherited IRAs are thus unlike traditional and Roth IRAs, both of which are quintessential "retirement funds." For where inherited IRAs categorically prohibit contributions, the entire purpose of traditional and Roth IRAs is to provide tax incentives for accountholders to contribute regularly and over time to their retirement savings.
>
> Second, holders of inherited IRAs are required to withdraw money from such accounts, no matter how many years they may be from retirement. . . . That the tax rules governing inherited IRAs routinely lead to their diminution over time, regardless of their holders' proximity to retirement, is hardly a feature one would expect of an account set aside for retirement.
>
> Finally, the holder of an inherited IRA may withdraw the entire balance of the account at any time – and for any purpose – without penalty. Whereas a withdrawal from a traditional or Roth IRA prior to the age of 59½ triggers a 10 percent tax penalty subject to narrow exceptions – a rule that encourages individuals to leave such funds untouched until retirement age – there is no similar limit on the holder of an inherited IRA. Funds held in inherited IRAs accordingly constitute "a pot of money that can be freely used for current consumption," not funds objectively set aside for one's retirement.

Id. (citations omitted).

The entire focus of the decision was on the purpose of traditional IRAs as opposed to inherited IRAs – to encourage saving for retirement. The decision has nothing to do with what types of assets may be held in IRAs or other retirement plans for purposes of the definition of "retirement funds" in § 522(b)(3)(C). There is no reason to suppose the Court intended to exclude from the definition of "retirement funds" real property, stocks, bonds, gold, or any other type of asset often, if not commonly, held in traditional and Roth IRAs. The court agrees with another department of this court on the issue:

/ / /

- 15 -

1
2
3
4
5

> [T]he court is not prepared to conclude that
> "retirement funds" exclude real property assets.  All
> IRAs have some form of investment assets.  Most often,
> IRAs hold liquid assets, including stocks and/or bonds.
> But IRAs rarely have only "funds" in the strictest
> sense of that word.  Thus, to construe "retirement
> funds" to exclude assets, whether stocks, mutual funds,
> bonds, or real estate, would make the § 522(b)(3)(C)
> exemption largely unusable.

6  In re Williams, 2011 Bankr. LEXIS 5584, *24 (Bankr. E.D. Cal.

7  2011) (J. McManus).

8      Returning to the language the trustee relies on in Clark, it

9  is this:

10
11
12
13
14
15
16

> The Bankruptcy Code does not define "retirement funds,"
> so we give the term its ordinary meaning.  See Octane
> Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S.
> ___, ___, 134 S. Ct. 1749, 188 L. Ed. 2d 816 (2014).
> The ordinary meaning of "fund[s]" is "sum[s] of money .
> . . set aside for a specific purpose."  American
> Heritage Dictionary 712 (4th ed. 2000).  And
> "retirement" means "[w]ithdrawal from one's occupation,
> business, or office."  Id., at 1489.  Section
> 522(b)(3)(C)'s reference to "retirement funds" is
> therefore properly understood to mean sums of money set
> aside for the day an individual stops working.

17  Clark, 134 S. Ct. at 2246 (emphasis added).  The trustee relies

18  on this language for his definition of "retirement funds" as

19  "sum[s] of money" and not real property.  This interpretation

20  hinges on the ellipsis – the missing words in the dictionary

21  definition as quoted by the Court – the words represented by ". .

22  .".  The actual definition of "fund" in the dictionary the Court

23  used is:  "sum of money or other resources set aside for a

24  specific purpose."  "fund." AHDictionary.com. American Heritage

25  Dictionary, 2016. Web. 23 May 2016.[5]

26

27
28

_____

    5.  The dictionary provides a second distinct definition of
"fund":  "Available money; ready cash: short on funds."  Id.  It
                                              (continued...)

The trustee believes the Supreme Court's omission of the words "and other resources" in its quotation from the dictionary necessarily means the Court intended to define "retirement funds," for purposes of § 522(b)(3)(C), as excluding "other resources"; that is, resources other than "sums of money." The trustee is not correct. First, the nature of the assets in the retirement account at issue in <u>Clark</u>, as either money, investments, gold, real property, or some other type of property, had nothing to do with the outcome of the case. The outcome hinged entirely on the legal differences between an IRA inherited by the debtor and an IRA created and funded by the debtor. Second, the trustee's argument overlooks or disregards the statement in <u>Clark</u> that traditional and Roth IRAs, unlike inherited IRAs, "are quintessential 'retirement funds.'" 134 S. Ct. at 2247. If the trustee's interpretation were correct, that statement would have to be rephrased as "some traditional and Roth IRAs are quintessential 'retirement funds'; many others – those containing anything other than money – are not retirement funds at all."

The court is persuaded the Supreme Court could not have intended to make, by nothing more than omitting the words "or other resources" from a dictionary definition, such a new and wide-ranging announcement of the definition of "retirement funds" as excluding entire categories of assets commonly held in IRAs, Roth IRAs, and other retirement plans. If the Court had intended

---

5. (...continued)
appears this is the definition the trustee would prefer; it is not the one chosen, however, by the Court in <u>Clark</u>.

- 17 -

to exclude from the definition all types of assets other than "sums of money" – stocks, bonds, interests in mutual funds, commodities, real property – it would have been far more explicit.

Finally, the trustee's restrictive reading of "retirement funds" runs counter to Congress' intent in enacting § 522(b)(3)(C), which was "to preempt conflicting state exemption laws and 'to expand the protection for tax-favored retirement plans or arrangements that may not be already protected under [§] 541(c)(2) pursuant to Patterson v. Shumate, or other state or Federal law.'" Hamlin, 465 B.R. at 870, quoting H. R. REP. NO. 109-31(I), pt.1 at 63-64 (2005), as reprinted in 2005 U.S.C.C.A.N. (Legislative History) 88, 132-33 (emphasis added).

### The Wells Fargo Bank and Scottrade Accounts

The trustee contends the funds in the Wells Fargo Bank and Scottrade accounts are not exempt because they are not part of the Plan to begin with.  The trustee relies on (1) the Business Account Application under which the Wells Fargo account was opened (the "Application"); and (2) two checks drawn on that account which the debtor used to open and later transfer additional funds to the Scottrade account.  (Thus, if the Wells Fargo account is not part of the Plan, the Scottrade account is not either, as the funds in that account were drawn from the Wells Fargo account.)  In the trustee's view, the Application demonstrates that the debtor opened the account in his individual name, and thus, the account is a personal account and not an account belonging to the Plan.  The debtor has submitted a copy of the check he used to open the Wells Fargo account – it is

drawn on an account at U.S. Bank entitled, as imprinted on the check, Pomeroy Retirement Trust, Scott C. Pomeroy, Trustee. The trustee does not admit, but he also does not dispute, that the funds transferred by way of that check were funds belonging to the Plan.[6]

The Application is confusing. It is on a Wells Fargo pre-printed form and, as the typed or printed information added to the form includes numbers that would have been known only to the bank, it was presumably typed or printed from information entered by the bank's representative, not the debtor. Page 1 of the form includes blanks for information about "Customer 1" and "Customer 2," which were completed as follows:

```
Customer 1 Name:            Scott C. Pomeroy
Account Relationship:       Sole Owner

Customer 2 Name:            Pomeroy Retirement Trust
Account Relationship:       Associated Party
```

These entries create ambiguity as to whether the account belongs to the debtor or the Plan. Page 2 of the Application has blanks for "Customer 1 Information," which include the following:

```
Customer Name:                   Pomeroy Retirement Trust
Account Relationship:            Associated Party
Taxpayer Identification Number:  XXXX4667 [the Plan's TIN]
Business Type:                   Sole Proprietorship
Date Originally Established:      01/01/1994 [the date the Plan
                                 was created]
```

At the bottom of page 2, for "Bank Use Only," are these entries (among others):

/ / /

_____

6.  "The source of the deposited funds may have been the Plan, but the account [at Wells Fargo] was opened by the Debtor in his individual name . . . ."  Memo. at 12:21-22.

- 19 -

```
Name/Entity Verification:              Other Agreement
Filing State:                          CA
Customer 1 Name:                       Pomeroy Retirement Trust
```

Page 3 has blanks for "Sole Proprietor 1 Information," which

include the following:

```
Customer Name:                         Scott C. Pomeroy
Position/Title:                        real estate
Taxpayer Identification Number:        XXXX8236 [the debtor's social
                                       security number]
```

Finally, Page 4 is the signature page; it reads:

```
Certified/Agreed To
Owner/Key Individual 1 Name:           Scott C. Pomeroy
Position/Title:                        real estate
```

And it bears the debtor's signature; the word "trustee" does not

appear behind the signature.

Thus, these facts support the trustee's position:  (1) the

debtor signed the application without using the word "trustee";

(2) the Application refers to the debtor as the customer in two

places – under "Customer 1 Name" and "Customer Name"; and (3) the

Application refers to the debtor's Account Relationship as "Sole

Owner."  On the other hand, (1) the Application refers to the

debtor as "Owner/Key Individual" (on page 4), which reasonably

should be construed to mean the debtor is the owner of the

account or the key individual in the entity that owns the

account; (2) the Application refers to the Plan twice as the

"Customer," albeit one of those times as "Customer 2"; (3) the

pre-printed portion of the Application states that "[t]he

Customer has approved this Certificate of Authority or granted

each person who signs the 'Certified/Agreed To' section of this

Application the authority to do so on the Customer's behalf by: .

. . the signature of each of the Customer's trustee(s), if the

Customer is a trust . . .," which lessens the significance of the debtor's signature without "Trustee" behind it; and (4) the reference to "Other Agreement" under "Name/Entity Verification," which suggests the bank representative reviewed the agreement under which the Plan was created.  If the debtor were to be the owner of the new account, the bank representative would not have required that verification.

In addition, and of significance, the debtor made the U.S. Bank check by which he opened the account payable to Pomeroy Retirement Trust, signed it as Scott C. Pomeroy, Trustee, and endorsed it as Scott C. Pomeroy, Trustee.  On the deposit slip, under "For Deposit to the Account of," the debtor wrote Pomeroy Retirement Trust.  The checks on the account are imprinted "Pomeroy Retirement Trust, Scott C. Pomeroy, Trustee," and of the six checks submitted by the trustee, the debtor signed five of them "Scott C. Pomeroy, Trustee."  He testifies he omitted "Trustee" after his signature on the sixth check because he was in a hurry.  His habit is to sign with "Trustee."  He adds that the only checks he has written from the account have been for property taxes and association dues on the vacant lot and to make the two transfers to open and then add to the Scottrade account. The Scottrade account statements are issued to "Scott C. Pomeroy TTEE, Pomeroy Retirement Trust Plan, U/A DTD 1/01/1994."

Finally, the debtor has submitted declarations of Ben Eastman, the president of Pension Services, Inc., who created, administered, and advised the debtor on the management of the Plan since its creation in 1994, and David M. Kahn, a Pennsylvania attorney who has specialized for 25 years in ERISA

- 21 -

1  compliance, including as an investigator and manager with the
2  U.S. Department of Labor's Employee Benefit Security
3  Administration.  The court finds that both are well-qualified to
4  offer the opinions they testify to.  Mr. Eastman and Mr. Kahn
5  have both examined the Application.  Mr. Eastman notes Wells
6  Fargo accepted the debtor's signature on the Application without
7  the "Trustee" suffix, and testifies it is common for a bank to
8  accept a trustee's signature without the suffix.  Mr. Kahn
9  testifies the use of the Plan's tax ID number as well as the
10  individual's for the creation of the account is uniform in his
11  experience.

12      At the initial hearing, although not in his initial reply,
13  the trustee challenged Mr. Eastman's and Mr. Kahn's
14  qualifications to testify as experts on the subject of banking,
15  and suggested the court hold an evidentiary hearing with someone
16  to testify as to whether Wells Fargo Bank saw the Application as
17  opening a trust account or a personal account.  The court finds
18  the many ways in which the Bank has treated this as a trust
19  account, discussed above, to be sufficient on the subject.  To
20  conclude, based on Mr. Eastman's and Mr. Kahn's testimony and the
21  court's own analysis, above, the court concludes that the Wells
22  Fargo and Scottrade accounts are assets of the Plan.

23      The Plan as Tax Exempt

24      With regard to the Plan as a whole; that is, as to both the
25  vacant lot and the Wells Fargo and Scottrade accounts, the
26  trustee contends the Plan does not qualify as exempt under §
27  522(b)(3)(C) because the debtor has not demonstrated it is exempt
28  from taxation under § 401, 403, 408, 408A, 414, 457, or 501(a) of

the Internal Revenue Code.    There are alternative tests for
making this determination.    First, if the Plan has received a
favorable determination under Internal Revenue Code § 7805 and
the determination is in effect as of the petition date, the Plan
will be presumed to be exempt.    Bankruptcy Code § 522(b)(4)(A).
If there has been no favorable determination, the debtor must
demonstrate either (1) that no prior determination to the
contrary has been made by a court or the IRS and that the Plan is
in substantial compliance with the applicable requirements of the
Internal Revenue Code; or (2) that the Plan fails to be in
substantial compliance with those requirements and the debtor is
not materially responsible for that failure.    § 522(b)(4)(B).

The debtor has submitted what he contends is a favorable
determination letter from the IRS.    The letter constitutes an
approval of the form of Pension Services, Inc.'s volume submitter
profit sharing plan.    The letter begins, "In our opinion, the
form of the plan identified above is acceptable under section 401
of the Internal Revenue Code for use by employers for the benefit
of their employees."    Debtor's Ex. G.    The Plan in this case has
adopted that form plan (Trustee's Ex. 1, DN 40, pp. 4-17), and
both Mr. Eastman and Mr. Kahn testified initially that the Plan
"falls under" that letter of determination and is a qualified
retirement plan.    At the initial hearing, however, the trustee's
counsel challenged the IRS letter as merely a blanket approval of
a form plan, not an approval of the specific plan in this case.

In response, the debtor has submitted supplemental
declarations in which Mr. Eastman and Mr. Kahn testify that a
"volume submitter approval letter serves as a pre approval

- 23 -

(without the need for a separate approval letter from the IRS) on a retirement plan, as long as the plan conforms to the approved plan related to the volume submitter." Eastman Supp. Decl., DN 53, ¶ 4; Kahn Supp. Decl., DN 54, ¶ 4. They add that the Plan in this case conforms to Pension Services, Inc.'s form plan approved by the IRS letter, and Mr. Eastman adds that the IRS letter was still active on the date this case was filed, August 14, 2015. Both Mr. Eastman and Mr. Kahn also testify that in their experience, when the IRS issues a determination that a particular plan is not approved, "those determinations are issued within 3 years or less of the first tax return." Eastman Supp. Decl., ¶ 5; Kahn Supp. Decl., ¶ 5. Mr. Eastman testifies the Plan has been in existence since 1994 and no contrary determination has been issued for either the volume submitter form plan or the debtor's plan.

In light of the court's finding that Mr. Eastman and Mr. Kahn qualify to give an expert opinion as to the status of the Plan, in light of their conclusions that the Plan "falls under" the IRS approval letter and conforms to the approved form plan such that no additional approval letter is needed, and where there is no evidence to the contrary, the court concludes the IRS letter is equivalent to a favorable determination as to the Plan, within the meaning of § 522(b)(4)(A). Although the letter itself states it is not a determination as to whether an employer's plan qualifies under Internal Revenue Code § 401(a), it also states that an employer that adopts the form plan may rely on the letter with respect to the qualification of its particular plan in certain circumstances. The letter cites Rev. Proc. 2005-16,

which includes provisions delineating the circumstances in which
an employer can rely on an opinion letter governing a volume
submitter form plan as applying also to the employer's specific
plan (see Rev. Proc. 2005-16, § 19.02), in which case the opinion
letter is the equivalent of a favorable determination letter.
Id. at § 19.04.[7]  It is appropriate to infer from Mr. Eastman's
and Mr. Kahn's testimony, and the court does infer, that the IRS
letter is equivalent to a favorable determination concerning the
Plan in this case.  In fact, they could not have testified as
they did if they were not satisfied the necessary circumstances
were present.[8]

In his response to Mr. Eastman's and Mr. Kahn's supplemental
declarations, the trustee cites three cases for his proposition
that "an opinion letter regarding the acceptability of a 'master'
or 'prototype' plan is not the same as a determination letter for
the terms of a particular plan."  Trustee's Reply to Supplemental
Declarations, DN 57 ("Supp. Reply"), at 3:22-24.  Those cases are
distinguishable.  In two of them, RES-GA Dawson, LLC v. Rogers
(In re Rogers), 538 B.R. 158 (Bankr. N.D. Ga. 2015), and Agin v.

7.   Rev. Proc. 2015-36 appears to be the most recent updated
version of Rev. Proc. 2005-16.  It contains virtually identical
provisions.  See Rev. Proc. 2015-36, §§ 19.02, 19.04.

8.   Mr. Eastman and Mr. Kahn were not required to list the
particular circumstances in which a letter approving a form plan
is the equivalent of a favorable determination of a specific
plan, to list all of the exceptions to those circumstances, and
to discuss the debtor's plan in terms of every one of those.
Their conclusions and the reasons for them are sufficient.  "An
opinion is not objectionable just because it embraces an ultimate
issue."  Fed. R. Evid. 704(a).  "Unless the court orders
otherwise, an expert may state an opinion--and give the reasons
for it--without first testifying to the underlying facts or
data."  Fed. R. Evid. 705.

1   Daniels (In re Daniels), 452 B.R. 335 (Bankr. D. Mass. 2011),

2   there was no evidence from anyone other than the debtor; thus,

3   there was no expert testimony linking the debtor's plan with the

4   IRS letter approving the form plan.  In the third, In re Bauman,

5   2014 Bankr. LEXIS 742 (Bankr. N.D. Ill. 2014), the owner of the

6   pension company that administered the debtor's plan testified,

7   but the court found his testimony to be contradicted by the

8   documentary evidence (2014 Bankr. LEXIS 742 at *5-7 and n.4) and

9   otherwise insufficient (id. at *24 ["Ronczkowski could not

10  explain the variances."]).  Further, there was no testimony

11  identifying the debtor's plan with the IRS letter approving the

12  form plan.  See id. at *42, n.15.

13      Unlike the cases cited by the trustee, where the courts

14  found either no evidence or insufficient evidence, the court in

15  In re Gilbraith, 523 B.R. 198 (Bankr. D. Ariz. 2014), cited Rev.

16  Proc. 2005-16 and found that the evidence in that case supported

17  the conclusion that IRS letters approving the prototype plan

18  created by the debtor's attorneys for the use of their employer

19  clients were the equivalent of a favorable determination of the

20  debtor's particular plan.  523 B.R. at 208.  In the present case,

21  given the testimony of Mr. Eastman and Mr. Kahn, whom the court

22  has found qualified to render an expert opinion on the status of

23  the debtor's Plan, and given the absence of any contrary

24  evidence, the court finds the IRS letter, Debtor's Exhibit G,

25  qualifies as a favorable determination of the Plan, under §

26  522(b)(4)(A); thus, the Plan is presumed exempt.  The trustee has

27  not rebutted that presumption.

28  / / /

- 26 -

However, the court will also assume for the sake of argument that the letter is not a favorable determination as to the Plan, within the meaning of § 522(b)(4)(A), and consider whether no prior determination to the contrary has been made by a court or the IRS and whether the Plan is in substantial compliance with the applicable requirements of the Internal Revenue Code, such that the Plan would be exempt under § 522(b)(4)(B) if it were not exempt under § 522(b)(4)(A). By its terms, the statute puts the burden of proof on the debtor. See § 522(b)(4)(B); Diamond v. Trawick (In re Trawick), 497 B.R. 572, 585 (Bankr. C.D. Cal. 2013). The trustee concedes the first point – that there has been no prior determination as to the Plan that was contrary to a favorable determination. As to the second, the court finds Mr. Eastman and Mr. Kahn are qualified to render expert opinions as to IRS requirements for tax-exempt retirement accounts and to render an opinion as to whether the Plan satisfies those requirements. Both testify the Plan is tax-exempt.

Mr. Eastman testifies he has administered the Plan and advised the debtor on its management since the Plan was created in 1994. He has met with the debtor at least once each year to discuss the permitted contribution amounts and actions that could be taken by the trust, including "the options for participant loans, hardship withdrawals, the division of the retirement upon [the debtor's] divorce, and investment avenues to diversify the retirement funds." Eastman Decl., DN 45, ¶ 11(a). He adds, "I have reviewed the history of [the debtor's] actions related to the trust and find nothing that would invalidate the trust[']s protection and treatment under Section 401(a), 403(a), 403(b),

408, or 408A of the Internal Revenue Code of 1986" (id. at ¶ 12),
and he concludes that the Plan is a qualified retirement plan
exempt from taxation.  In his supplemental declaration, he adds
that the Plan "is in compliance with the Internal Revenue Code
both today and on the date of filing referenced above."  Eastman
Supp. Decl., DN 53, at ¶ 5(c).

Mr. Kahn, who has been in the field for 25 years, testifies,
"I have familiarized myself with the provisions of the Pomeroy
Retirement Trust Plan and find that it meets all the requirements
of Section 401(a), 403(a), 403(b), 408, or 408A of the Internal
Revenue Code of 1986 as a qualified retirement [plan]."  Kahn
Decl., DN 46, ¶ 13.  Both Mr. Eastman and Mr. Kahn have testified
the Plan conforms to Pension Services, Inc.'s volume submitter
form plan, which has been approved by the IRS as "acceptable
under section 401 of the Internal Revenue Code for use by
employers for the benefit of their employees."  Debtor's Ex. G.
The debtor testifies he has received "no negative treatments or
determinations from the IRS for the entire existence of the
[Plan]."  Pomeroy Decl., DN 55, ¶ 6.

As against this evidence, the trustee's arguments are not
persuasive.  He places great emphasis on the use of the
disjunctive in the phrase "Section 401(a), 403(a), 403(b), 408,
or 408A of the Internal Revenue Code" in the declarations,
concluding by inference that the declarants "have no idea what
the applicable statute is."  Supp. Reply at 8:9.  Mr. Eastman's
and Mr. Kahn's respective levels of experience and expertise
preclude that possibility.  Further, the court can itself
determine – from the IRS's letter alone – that the applicable

- 28 -

section is § 401(a), governing pension, profit-sharing, and stock bonus plans, as opposed to § 403 (employee annuities), § 408 (IRAs), or § 408A (Roth IRAs).

Second, the trustee finds Mr. Eastman's and Mr. Kahn's testimony too conclusory. He would apparently require testimony that "the operation of the Plan, over the years since it was established in 1994, has always been in compliance with either the terms of the Plan or the requirements of the Internal Revenue Code" (Supp. Reply at 9:9-11), and he complains there is no testimony about the "specific amounts contributed to the Plan, the source of contributions to the Plan, maintenance of the Plan assets in trust, disbursements by the Plan, investments made by the Plan, rollovers (if any), division of the plan assets with the Debtor's former spouse in connection with their divorce, or the requirements for taking a hardship distribution from the Plan." Id. at 9:11-15. These arguments are red herrings. This level of detail and a time frame covering decades is simply not required by the statute, which requires only that the Plan be "exempt from taxation" under federal law, which may be proven by a showing that the Plan "is in substantial compliance" with the applicable provisions of the Internal Revenue Code.

The trustee cites no authority for these extraordinary requirements except cases concerning conclusory allegations unsupported by facts as being insufficient to raise a triable issue of material fact in opposition to a summary judgment motion. The cases cited do not concern expert testimony, as to which the rules differ. In arriving at a "proper accommodation between [Fed. R. Civ. Proc.] 56(e) [now 56(c)(4)] and Fed. R.

- 29 -

Evid. 705," the Ninth Circuit has held that "[e]xpert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not.  If further facts are desired, the movant may request and the district court may require their disclosure." Bulthuis v. Rexall Corp., 789 F.2d 1315, 1318 (9th Cir. 1986).[9]

Applying this accommodation, the court is satisfied the expert testimony sufficiently states a factual basis for the opinions offered.  The fact that Mr. Eastman has played a regular and active role in administering the Plan and advising the debtor about the permitted contribution amounts, the options for participant loans, hardship withdrawals, the division of the plan assets with the debtor's former spouse, and appropriate investment vehicles is significant.  The trustee contends Mr. Eastman's conclusion that he has "reviewed the history of [the

---

9.  "Unless the court orders otherwise, an expert may state an opinion--and give the reasons for it--without first testifying to the underlying facts or data.  But the expert may be required to disclose those facts or data on cross-examination."  Fed. R. Evid. 705.  In his initial reply, the trustee said this about Mr. Eastman and Mr. Kahn:  "[E]xcept for conclusory and ambiguous statements contained in declarations from professionals in the field, who may or may not be qualified to provide expert testimony, there is nothing to show that the Debtor's plan is qualified under the Internal Revenue Code."  Initial Reply at 1:1-4.  Although the debtor had offered in his opposition to make his expert witnesses available at an evidentiary hearing, the trustee did not take the debtor up on that offer, and did not request an evidentiary hearing in his initial reply, as required under LBR 9014-1(f)(1)(C).  The trustee did request an evidentiary hearing at the initial hearing, after the court had issued its original tentative ruling, but only with regard to the issue of the debtor's application to open the Wells Fargo Bank account.

1  debtor's] actions related to the trust and find[s] nothing that

2  would invalidate the trust[']s protection and treatment" under

3  the Internal Revenue Code has "no facts to back it up."  Supp.

4  Reply at 10:13.  It is difficult to know what the trustee would

5  require unless it is a list of every possible action that could

6  disqualify a retirement plan as tax exempt, with facts to prove a

7  negative:  that the debtor has not taken any of them.  Here, both

8  Mr. Eastman and Mr. Kahn have addressed in factual terms the

9  particular issues raised by the trustee – the hardship

10  distributions, the QDRO distributions, and the Wells Fargo Bank

11  account application.  Mr. Kahn, for example, states that in other

12  cases he has been involved in,

13         the IRS has never sought nor asserted a right to
       invalidate such a retirement plan due to undocumented
14         participant loans or other minor errors such as
       forgetting to add "trustee" or "TTee" at the signature
15         line.  In fact, the standard course of action in such
       cases is to document such loans retroactively and pay a
16         small penalty for the failure or to consider them
       retroactive hardship withdrawals and to pay the
17         taxation on the withdrawal.  I have never seen the IRS
       use either the documentation of a participant loan or a
18         vague bank account application as a reason to
       invalidate a qualifying retirement [plan].
19

20  Kahn Decl. at 3:6-13.  The court finds this and Mr. Eastman's

21  testimony to be sufficient.

22         Finally, the trustee cites the "voluminous discussion" in

23  Internal Revenue Code § 4975 of prohibited transactions –

24  transactions that may result in disqualification of a retirement

25  plan from tax-exempt status – and suggests the debtor should have

26  tackled that discussion in order to demonstrate that the Plan is

27  in substantial compliance with the Internal Revenue Code.  "The

28  Trustee will not attempt to prove or disprove whether the Debtor

- 31 -

has engaged in prohibited transactions.  It was up to the Debtor
to deal with the fact that he may have engaged in prohibited
transactions, or to present evidence that he did not engage in
any prohibited transactions . . . ."  Supp. Reply at 9:20-23.
The court disagrees.  The statute contains a list of prohibited
transactions followed by a much longer list of exemptions from
prohibited transactions, followed by a list of "special rules,"
including a list of transactions to which certain of the
exemptions do not apply, and so on.  It seems the trustee would
extend the debtor's burden of proof as to the § 522(b)(4)(B)
showing to cover every possible way in which a retirement plan
can be disqualified, even as to particular types of transactions
no one has suggested occurred here.  Simply put, the court does
not view the burden of proof in that way.

The trustee's only suggestion that the debtor has done
anything wrong – apart from the Wells Fargo Bank account
application – is that the debtor has deposited repayments on a
loan made by the Plan to a third party into his personal bank
account.  The trustee characterizes this conduct as follows:

> [The debtor] essentially admits that he diverted loan
> repayments for a loan made by his Plan into his own
> pocket, without reporting the receipt of income and
> without reimbursing the Plan.  He now says that he
> intends to treat the monies received as a "hardship
> distribution" and amend his last three years taxes to
> acknowledge the receipt of unreported income.  He
> completely fails to address whether the improper
> handling of the loan repayments for at least three
> years might have been a prohibited transaction which
> would disqualify his Plan as a valid retirement plan.

Supp. Reply at 11:6-12.

On the contrary, Mr. Eastman testifies the loan repayments
will be treated as hardship distributions, the debtor will pay

- 32 -

the appropriate taxes and penalty, and neither documenting the repayments in that fashion nor the hardship withdrawals themselves will invalidate the Plan's tax-exempt status.  Mr. Kahn testifies he has never seen the IRS seek to invalidate a retirement plan due to undocumented participant loans, and that the standard course of action in such cases is to document the loans retroactively and pay the tax on the withdrawals.

The Internal Revenue Code itself does not provide for disqualification of a plan based on a prohibited transaction. Instead, "[t]here is hereby imposed a tax on each prohibited transaction.  The rate of tax shall be equal to 15 percent of the amount involved . . . ."  26 U.S.C. § 4975(a).  And "[g]enerally, the occurrence of a prohibited transaction does not disqualify a profit sharing plan . . . ."  RES-GA Dawson, LLC v. Rogers (In re Rogers), 538 B.R. 158, 169 (Bankr. N.D. Ga. 2015).  On the other hand, "if a multitude of prohibited transactions exist, such that the form of the profit sharing plan is being abused, then the plan may no longer be qualified."  Id.; see also Agin v. Daniels (In re Daniels), 452 B.R. 335, 350-51 (Bankr. D. Mass. 2011). For example,

> Rather than do what was necessary for favorable tax treatment under the IRC, Bauman treated the Plan as little better than a fancy bank account.  Ignoring the Plan documents and the law, Bauman added money to the Plan - lots of it - whenever he felt like it.  Bauman then withdrew money from the Plan after his retirement, although he was not entitled to any distributions, in amounts that made no sense.  The contributions as well as the distributions failed to comply with the IRC and disqualified the Plan from favorable tax treatment. The Bauman Venture Plan was a mere facade, a pension plan in name only.

In re Bauman, 2014 Bankr. LEXIS 742, *53 (Bankr. N.D. Ill. 2014).

- 33 -

The present case involves no such routine or abusive conduct.  In this regard, it is more akin to <u>In re Gilbraith</u>, 523 B.R. 198, 208 (Bankr. D. Ariz. 2014), than to <u>Daniels</u> or <u>Bauman</u>. In <u>Gilbraith</u>, the debtor had made minor mistakes which he then corrected.  The court referred to the lack of precedent for plan disqualification based solely on the kinds of mistakes the debtor had made and the IRS's "fairly forgiving" attitude toward them. <u>Id.</u> at 209.  "In any event, failure to timely file 5500 Reports appears to, at most, be a matter of assessing civil penalties not the outright disqualification of an offending plan."  <u>Id.</u> at 205-06.  In the present case, the court accepts Mr. Eastman's and Mr. Kahn's testimony and concludes that the debtor's documentation and treatment of the loan repayments as hardship distributions, although retroactive, will not result in disqualification of the Plan.

<u>The Debtor's Standard of Proof</u>

The trustee cites <u>Carter v. Anderson (In re Carter)</u>, 182 F.3d 1027 (9th Cir. 1999), for his proposition that the standard of proof the debtor must satisfy is "unequivocal" evidence. Discussing Fed. R. Bankr. P. 4003(c) and citing a bankruptcy court decision from the Northern District of Illinois that had used the term "unequivocal," the court stated that when the party objecting to an exemption has produced evidence sufficient to overcome the presumptive validity of an exemption claim, the debtor must "come forward with unequivocal evidence to demonstrate that the exemption is proper."  <u>Carter</u>, 182 F.3d at 1029 n.3.

/ / /

1    The Bankruptcy Appellate Panel in <u>Kelley v. Locke (In re</u>
2  <u>Kelley)</u>, 300 B.R. 11 (9th Cir. BAP 2003), quoted this same
3  language from <u>Carter</u> and then held that the trustee's burden of
4  proof to overcome the presumptive validity of an exemption is
5  preponderance of the evidence.  300 B.R. at 17.  The panel quoted
6  an earlier decision as holding that, "[i]n civil cases, the
7  objecting party need only provide proof sufficient to meet the
8  'preponderance of the evidence' standard, as opposed to the more
9  stringent 'clear and convincing evidence' standard."  <u>Id.</u> at 16.
10 The panel cited <u>United States ex rel. Farmers Home Admin. v.</u>
11 <u>Arnold & Baker Farms</u>, 177 B.R. 648, 654 (9th Cir. BAP 1994),
12 which held that the debtor's standard of proof on plan
13 confirmation is preponderance of the evidence.

14    The panel in <u>Arnold & Baker</u>, in turn, noted that the U.S.
15 Supreme Court and the Tenth Circuit had held, respectively, that
16 the standard of proof for the creditor in non-dischargeability
17 and bar to discharge cases is preponderance of the evidence
18 (citing <u>Grogan v. Garner</u>, 498 U.S. 279, 285 n.11 (1991), and <u>In</u>
19 <u>re Serafini</u>, 938 F.2d 1156, 1157 (1991)).  The panel concluded
20 that "[a]lthough the holdings in <u>Grogan</u> and <u>Serafini</u> could
21 arguably be limited in its application to creditors, we find no
22 sufficient justification for imposing a heightened burden of
23 proof on the debtor in plan confirmation."  <u>Arnold & Baker</u>, 177
24 B.R. at 655.  This court finds no sufficient justification for
25 holding a debtor to an "unequivocal" evidence standard of proof
26 on an objection to exemptions when the standard for the trustee
27 is preponderance of the evidence, and there is no binding
28

1  authority for an "unequivocal" evidence standard.[10]

2       Finally, the court rejects the trustee's conclusion that the

3  debtor has "deliberately create[d] ambiguities with respect to

4  his retirement assets, in the hope that he will be able to remove

5  them from his account without anyone realizing what he has done,

6  and without paying taxes on the withdrawn funds."  Initial Reply

7  at 12:9-12.  The lynchpin of the argument is the debtor's amended

8  Schedule C, on which the Wells Fargo Bank and Scottrade accounts

9  were dropped from the list of assets appearing under the Plan

10 heading in the description column.  On the original Schedule C,

11 the description of the Plan was:

12 ERISA Qualified Retirement Account managed
   by Pension Services Inc. agent Ben Eastman,
13 CPA, account named the Pomeroy Retirement
   Trust
14 The retirement account includes:
   1.property titled to the account with an address
15 of 10646 Tudor Lane, Truckee, CA 96161 Lot
   #4, valued at $185,000.
16 2. Retirement acct held with Wells Fargo acct
   ending ...5137 balance $170,780.74
17 3. Retirement acct held with Scottrade acct
   ending...5500 balance $53,602.27
18
   On the amended Schedule C, the Plan was described as:
19
   ERISA Qualified Retirement
20 Account managed by Pension Services
   Inc. agent Ben Eastman, CPA, account
21 named the Pomeroy Retirement Trust
   The retirement account includes:
22 1.property titled to the account with an
   address of 10646 Tudor Lane, Truckee,
23 CA 9616

24

25       10.  The reference to unequivocal evidence in <u>Carter</u> was
   dicta.  "There was no real dispute in the bankruptcy court or the
26 BAP concerning these burdens in the abstract.  Rather, the
   parties disputed the relationship between a subchapter S
27 corporation and a shareholder/employee under C.C.P. § 706.011,
   which was reflected in the disagreement about burdens of proof,
28 production, and persuasion."  <u>Carter</u>, 182 F.3d at 1029 n.3.

In both schedules, the "Value of Claimed Exemption" and the "Current Value of Property Without Deducting Exemption" were listed as $409,383.01. The court accepts the debtor's contention that he intended his amended Schedule C as a claim of exemption of all three assets, and rejects the following speculative contention of the trustee:

> The effect of [dropping the Wells Fargo account] was arguably to acknowledge that the bank account had in fact been distributed to him and was no longer part of his retirement plan. Presumably he was hoping that no one would require him to pay taxes on the distributed property. Then, when the Trustee accepted the view that the funds had been distributed to the Debtor, he took the position that the Trustee should have realized that he still intended to claim an exemption for the funds, on the basis that they were retirement funds. In other words, it was only when the problem was identified that he asserted that the funds were still retirement assets.

Initial Reply at 11:21-28. The trustee's interpretation does not explain why the value of the claimed exemption and the value of the asset without the exemption were both listed on the amended Schedule C as $409,383.01 or how either he or the IRS was likely to be mislead.

As support for his position that the debtor has exhibited a nefarious pattern of conduct, the trustee also cites the ambiguous nature of the Application, which the court found a bit confusing but not nearly sufficient to prove the account is the debtor's personal account, and complains about a loan the debtor made from the Plan as carrying a usurious interest rate and as providing income to the debtor he did not report on his tax returns. The trustee has not supported this argument with evidence or analysis.

/ / /

For the reasons stated, the objection will be overruled. The court will issue an order.

Dated: June 21, 2016

*Robert Bardwil*

ROBERT S. BARDWIL
United States Bankruptcy Judge

# Instructions to Clerk of Court
## Service List – Not Part of Order/Judgment

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the U.S. Mail.

Scott Charles Pomeroy
3381 Parkside Drive
Rocklin CA 95677

John R. Roberts
PO Box 1506
Placerville CA 95667

Office of the U.S. Trustee
Robert T Matsui United States
Courthouse
501 I Street, Room 7-500
Sacramento CA 95814

Christopher D Hughes
3017 Douglas Blvd # 300
Roseville CA 95661

Gregory J. Hughes
3017 Douglas Blvd #300
Roseville CA 95661

Lucas B. Garcia
13620 Lincoln Way, Suite 220
Auburn CA 95603